IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRCT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| JACQUELINE FELIX, | ) | CASE NO. 1:20-CV-01550-JG |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE JAMES GWIN |
| vs. | ) | UNITED STATES DISTRICT JUDGE |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | MAGISTRATE JUDGE |
| SECURITY, | ) | JONATHAN D. GREENBERG |
| | ) | |
| Defendant. | ) | **REPORT & RECOMMENDATION** |
| | ) | |
| | ) | |

Plaintiff, Jacqueline Felix ("Plaintiff" or "Felix"), challenges the final decision of Defendant, Kilolo Kijakazi,[1] Acting Commissioner of Social Security ("Commissioner"), denying her applications for Period of Disability ("POD"), Disability Insurance Benefits ("DIB"), and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act"). This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). This case is before the undersigned United States Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and Recommendation. For the reasons set forth below, the Magistrate Judge recommends that the Commissioner's final decision be VACATED AND REMANDED for further proceedings consistent with this opinion.

---

[1] On July 9, 2021, Kilolo Kijakazi became the Acting Commissioner of Social Security.

## I.    PROCEDURAL HISTORY

In July and August 2018, Felix filed an application for POD, DIB, and SSI, alleging a disability onset date of September 11, 2015[2] and claiming she was disabled due to: fibromyalgia; depression; PTSD; anxiety; mood disorder; dysthymic disorder; sleep disorder; and panic attacks.  (Transcript ("Tr.") 101, 113, 125, 140.)  The applications were denied initially and upon reconsideration, and Felix requested a hearing before an administrative law judge ("ALJ").  (*Id.* at 15.)

On September 18, 2019, an ALJ held a hearing, during which Felix, represented by counsel, and an impartial vocational expert ("VE") testified.  (*Id.*)  On October 4, 2019, the ALJ issued a written decision finding Felix was not disabled.  (*Id.* at 15-30.)  The ALJ's decision became final on June 26, 2020, when the Appeals Council declined further review.  (*Id.* at 1-8.)

On July 14, 2020, Felix filed her Complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 14-15.)  Felix asserts the following assignments of error:

(1)    The ALJ failed in his duty to evaluate the claimant's diagnosis of fibromyalgia in light of SSR 12-2p.

(2)    The ALJ failed to properly review the opinion evidence in the file.

(Doc. No. 14 at 13, 17.)

## II.    EVIDENCE

### A.    Personal and Vocational Evidence

Felix was born in November 1972 and was 46 years-old at the time of her administrative hearing (Tr. 28), making her a "younger" person under Social Security regulations.  *See* 20 C.F.R. §§ 404.1563(c),

---

[2] An ALJ issued an unfavorable decision on an earlier disability application on February 28, 2018, making the relevant period March 1, 2018 through October 4, 2019, the date of the ALJ's decision at issue in this case.  (Transcript ("Tr.") 15; Doc. No. 14 at 3.)

2

416.963(c).  She has at least a high school education and is able to communicate in English.  (Tr. 28.)  She

has past relevant work as a punch press operator.  (*Id*. at 27.)

## B.    Medical Evidence[3]

On March 1, 2018, Felix saw Susan O'Brien, APRN-CNS, for mental health treatment.  (*Id.* at

355.)  Felix reported she stopped taking several medications because she thought they made her feel

worse.  (*Id.*)  Felix told O'Brien she had seen a doctor at Metro who performed massage therapy and while

her pain went down during treatment, it returned to its normal level afterward.  (*Id.*)  O'Brien noted Felix

was off all psychiatric medications except for the occasional use of Prazosin and rare use of Klonopin.

(*Id.*)  Felix reported she sometimes thinks she is being watched or followed when she walks.  (*Id.*)  Felix

told O'Brien she was getting five to six hours of sleep a night, and experienced nightmares with or without

Prazosin so she took it infrequently.  (*Id.* at 356.)

On examination, O'Brien found Felix demonstrated a steady gait, good hygiene and grooming,

cooperative behavior, good eye contact, no unusual movements, normal speech, organized, liner, and goal-

directed thought process, fair judgment, and fair insight.  (*Id.*)  O'Brien found Felix fully oriented with a

depressed and anxious mood, depressed affect, and intermittent suicidal thoughts.  (*Id.*)  O'Brien noted

Felix experienced auditory and visual hallucinations, continued to be very forgetful, and while Felix could

follow and track conversation, she had difficulty with attention and concentration in other settings because

of her anxiety.  (*Id.*)  O'Brien determined Felix's mood was worse when her pain was worse, and

medication trials had been "partially effective at best."  (*Id.*)  Therefore, Felix had decided to stop taking

her medications altogether in the past month, although she remained willing to try a different medication.

(*Id.*)  O'Brien noted Felix had not been going to therapy.  (*Id.*)  O'Brien started Felix on Prozac.  (*Id.*)

---

[3] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the
evidence cited in the parties' Briefs.

On March 8, 2018, Felix saw Joseph Labastille, M.D., for complaints of nighttime twitching of her cheeks, intermittent shaking movements of her left upper eyelid, fibromyalgia, and GERD.  (*Id.* at 352.) Felix reported the cheek twitching was heightening her anxiety and she was worried about a possible stroke.  (*Id.*)  On examination, Dr. Labastille found Felix pleasant and cooperative, with no flat affect, and found no facial twitching.  (*Id.* at 353.)  Dr. Labastille started Felix on medication for her facial twitching. (*Id.* at 354.)  At the time, Felix was taking amitriptyline, Flexeril, and Gabapentin for her fibromyalgia. (*Id.*)

On March 19, 2018, Felix saw Travis Cleland, D.O., for follow up of her chronic generalized pain, low back pain, and left gluteal pain.  (*Id.* at 539.)  Dr. Cleland believed the pain to be myofascial in nature and noted Felix may be experiencing a fibromyalgia flare.  (*Id.*)  He noted he planned to assist Felix with her conservative care.  (*Id.*)  Since Felix's last visit, she had undergone an x-ray of the lumbar spine, which showed mild loss of lordosis, started tizanidine with no benefit, and completed two physical therapy sessions.  (*Id.*)  Felix reported doing the same, if not a little worse, since her last visit.  (*Id.*)  Felix told Cleland her current pain was in her low back and her legs felt "'tired.'"  (*Id.*)  Felix described her back pain as "constant and stabbing," rated the pain from a 6-9/10, and told Dr. Cleland it was worse with any activity.  (*Id.*)  Laying down alleviated her pain.  (*Id.*)  On examination, Dr. Cleland found no tenderness over the sacral spine area, SI joint, PSIS, or spinous process, although tenderness was present over the gluteal area and greater trochanter bilaterally and in the paraspinal region from L2 to L5 bilaterally.  (*Id.* at 541.)  While Felix demonstrated a reduced range of motion of her back, her gait was normal, and she had good heel to toe walk without foot drop.  (*Id.* at 541-42.)  Felix could heel walk, toe walk, and tandem walk.  (*Id.* at 542.)  Dr. Cleland increased Felix's Gabapentin dosage and prescribed Robaxin and a medrol dose pack.  (*Id.*)

4

On April 24, 2018, Felix saw O'Brien for follow up.  (*Id.* at 345.)  Felix reported she felt more depressed and that it was more emotional than physical, she felt tired all the time, she had been getting confused, and she was having poor memory.  (*Id.* at 346.)  O'Brien and Felix discussed ways to set one goal a week regarding nutrition, activity, and social skills (like seeing her grandchildren), and Felix "rejected most suggestions."  (*Id.*)  However, O'Brien noted Felix understood she needed to put in some effort and not just rely on her medications.  (*Id.*)  Felix reported not having a therapeutic response to Prozac.  (*Id.*)  On examination, Felix demonstrated a steady gait, good hygiene and grooming, cooperative behavior, good eye contact, no unusual movements, normal speech, organized thought process, fair judgment, and fair insight.  (*Id.*)  O'Brien found Felix fully oriented with a depressed, anxious, and unmotivated mood, appropriate but depressed affect, and intermittent suicidal thoughts.  (*Id.*)  O'Brien noted Felix experienced auditory and visual hallucinations at times, continued to be very forgetful, and while Felix could follow and track conversation, she had difficulty with attention and concentration in other settings because of her anxiety.  (*Id.*)  While O'Brien increased Felix's Prozac, O'Brien told Felix she needed to take steps to be more active in order to see progress and encouraged her to set weekly goals. (*Id.* at 347.)  O'Brien noted Felix's insomnia, nightmares, and PTSD were "somewhat improved of late." (*Id.*)  O'Brien "strongly" encouraged Felix to restart counseling, although Felix had not.  (*Id.*)

On April 25, 2018, Felix called the Cleveland Clinic to discuss attending a chronic pain and rehabilitation program but was unable to participate once she realized the hours were all day Monday through Friday.  (*Id.* at 333-34.)

On May 2, 2018, Felix saw Dr. Labastille for follow up.  (*Id.* at 342-43.)  Felix reported the twitching in her cheeks had improved and the twitching of her eyelid had stopped.  (*Id.* at 343.)  Felix complained of low back pain over the past three days that she described as "acute, screwing," and "constant" and which she rated as a 7/10 while sitting and a 10/10 when walking.  (*Id.*)  Felix reported the

pain sometimes radiated to her left groin.  (*Id.*)  On examination, Dr. Labastille found Felix experienced moderate discomfort getting on and off the consultation table and that she had "acute" back pain.  (*Id.* at 344.)  Dr. Labastille further found mild tenderness over the spinal process and paraspinal muscles, right more than left, at the L3-S1 levels, negative straight leg raise test bilaterally, and 5/5 strength in the bilateral lower extremities.  (*Id.*)  Dr. Labastille continued Felix's gemfibrozil, started her on a new medication for her lumbar sprain, and emphasized a low fat, low cholesterol diet.  (*Id.* at 345.)

On May 18, 2018, Felix saw Raymond Hong, M.D., for evaluation of her fibromyalgia.  (*Id.* at 534-35.)  Felix complained of forgetfulness, chronic, widespread pain, and increased low back and leg pain for the past two weeks.  (*Id.* at 535.)  Felix reported walking more than 15 minutes made her legs hurt and caused her to need to lay down.  (*Id.*)  Sitting for too long caused increased neck and low back pain. (*Id.*)  Felix reported all day low back stiffness that was worse with activity.  (*Id.*)  Felix described the pain as aching and the pain in her low back as pushing.  (*Id.*)  Felix told Dr. Hong the pain had been present for the past eight to nine years.  (*Id.*)  Felix denied any joint swelling.  (*Id.*)  Felix reported having tried duloxetine, methocarbamol, tizanidine, and Lyrica, all of which either did not work or caused side effects. (*Id.*)  Felix currently took Flexeril, which gave her mild pain relief but made her tired.  (*Id.*)  On examination, Dr. Hong found multiple tender points and a normal gait.  (*Id.* at 536.)  Dr. Hong noted Felix currently took Gabapentin, but it caused tiredness, and other medications had either been inadequate or caused side effects.  (*Id.* at 537.)  Dr. Hong stopped Flexeril and had Felix start baclofen.  (*Id.*)  He also ordered labs and that she start physical therapy.  (*Id.*)

On June 6, 2018, Felix saw Ranier Ng, D.O., for follow up.  (*Id.* at 527, 530.)  Felix reported discomfort in her hips and legs bilaterally, which Felix described as "achy" and rated as an 8/10.  (*Id.* at 530.)  Prolonged sitting or standing exacerbated her pain, while lying flat alleviated it.  (*Id.*)  Felix reported trying to walk for twenty minutes for exercise but that it caused pressure and pain in her legs

6

bilaterally.  (*Id.*)  Felix also complained of neck and upper back pain that caused more discomfort than her lower back pain.  (*Id.*)  Felix told Dr. Ng Gabapentin provided no relief.  (*Id.*)  Felix asked for a functional capacity evaluation for her disability application.  (*Id.*)  On examination, Dr. Ng found kyphosis, lumbar lordosis, tight paraspinal muscles in the thoracic and lumbar areas, multiple tender points, tight bilateral piriformis, and tight bilateral PSOAS.  (*Id.* at 533.)  Manual therapy administered during the appointment improved Felix's pain, she felt better, and she had improved range of motion and less tension.  (*Id.* at 533-34.)  Dr. Ng recommended muscle relaxants, aquatic therapy, yoga, and calf strain exercises.  (*Id.* at 534.)  Dr. Ng further recommended taking Gabapentin, Prozac, and baclofen.  (*Id.*)

On June 18, 2018, Felix saw Dr. Cleland for follow up.  (*Id.* at 524.)  Felix reported continued leg pain and low back pain.  (*Id.*)  Felix described the pain as constant and stabbing in the back and tight and achy in the right leg.  (*Id.*)  Felix again rated the pain as a 6-9/10.  (*Id.*)  Any activity and walking exacerbated the pain, and even walking for five minutes caused pain.  (*Id.*)  Rest alleviated the pain.  (*Id.*)  Felix also reported bilateral foot numbness, right leg weakness, impaired balance (including a fall two weeks earlier), and chronic headache.  (*Id.*)  On examination, Dr. Cleland found no tenderness over the sacral spine area, SI joint, PSIS, or spinous process, although tenderness was present over the gluteal area and greater trochanter bilaterally and in the paraspinal region from L2 to L5 bilaterally.  (*Id.* at 526.)  While Felix demonstrated a reduced range of motion of her back, her gait was normal, and she had good heel to toe walk without foot drop.  (*Id.* at 527.)  Felix could heel walk, toe walk, and tandem walk.  (*Id.*)  Dr. Cleland recommended Felix continue her Gabapentin and home exercise program and consult with neurology regarding her headaches.  (*Id.*)

On July 6, 2018 MRI revealed mild degenerative disc disease at the L5-S1 level with mild disc bulge, minimal facet arthropathy, and no neural compression.  (*Id.* at 523, 746.)

On August 3, 2018, Felix began physical therapy for her fibromyalgia pain.  (*Id.* at 706.)  Felix reported pain mainly in her shoulder blades, low back, and hips.  (*Id.* at 708.)  Felix reported living with her daughter, driving independently, and being independent with self-care, although she had difficulty doing her hair, cooking, cleaning, and fastening her bra.  (*Id.* at 709.)  Felix rated her pain as a 7/10 but it varied in intensity and she described it as aching.  (*Id.*)  Prolonged sitting, standing, and walking, as well as lifting and bending, aggravated her pain.  (*Id.*)  Medication, rest, and changing position alleviated her pain.  (*Id.*)  Felix stopped attending physical therapy after two visits in 2017 because she was depressed. (*Id.*)  Felix had also undergone aquatic therapy at the Cleveland Clinic.  (*Id.*)  On examination, Mark Linkinoggor, PT, DPT, found decreased range of motion, strength, and flexibility.   (*Id.* at 710-11.) Linkinoggor found Felix's ability to transition from sitting to standing and from a bed was independent but labored, she had poor body mechanics lifting an item from the floor to the waist, and her gait was independent but she had decreased right and left stance time and a flexed trunk.  (*Id.* at 711.)  Linkinoggor noted: "Frequent position changes. Unable to sustain sitting or standing for greater than 5 minutes with evaluation today.  She frequent[ly] shifts weight from side to side."  (*Id.*)

On August 8, 2018, Felix saw O'Brien for follow up.  (*Id.* at 754.)  Felix reported feeling worse both mentally and physically, complaining of a headache for the past month, chest pain for the past two weeks that her doctor told her was because of her fibromyalgia, anxiety and breathing issues at night, worsened memory that might be "fibro-fog" according to her rheumatologist, hearing multiple voices calling her name, and sleeping on and off night and day.  (*Id.*)  Felix told O'Brien she tried to spend time with her grandchildren but her back pain and neck pain were too much, and she just preferred to stay home.  (*Id.*)  Felix reported cooking for herself sometimes and that she felt less pain when laying down. (*Id.*)  Felix told O'Brien she was sleeping 10-11 hours and denied nightmares at night.  (*Id.*)

8

On examination, Felix demonstrated a steady gait, good hygiene and grooming, cooperative behavior, good eye contact, no unusual movements, normal speech, organized thought process, fair judgment, and fair insight.  (*Id.* at 755.)  O'Brien found Felix fully oriented with a depressed, anxious, mood, full and appropriate affect, and intermittent suicidal thoughts.  (*Id.*)  O'Brien noted Felix was rejecting all ideas because of her pain.  (*Id.*)  Felix continued to be very forgetful, and while Felix could follow and track conversation, she had difficulty with attention and concentration in other settings because of her anxiety.  (*Id.*)  O'Brien increased Felix's Prozac and stated: "Reiterated my belief that role of med is to help her cope with pain better but that she needs to follow advice of PT closely as they are the experts at helping those with chronic pain find the best ways to manage through it."  (*Id.*)  Felix was to schedule a counseling session.  (*Id.*)

On August 16, 2018, Felix saw Linkinoggor for her second physical therapy visit.  (*Id.* at 697.)  Felix reported no worsening of pain since her last appointment, although she was tired and felt achy all over, so she had lain in bed for most of the day before.  (*Id.* at 700.)  Linkinoggor noted Felix was "very apprehensive" to increase her activity levels at home.  (*Id.* at 703.)

On August 27, 2018, Felix saw Linkinoggor for her third physical therapy visit.  (*Id.* at 682.)  Felix reported her low back and hip pain had increased since her last appointment.  (*Id.* at 685.)  Linkinoggor noted poor physical therapy attendance but Felix had progressed to L5 resistance on the stationary bike. (*Id.* at 689.)  Felix reported being "minimally active at home," which Linkinoggor remarked was a "strong barrier to any improvement with functional activity tolerance, activity pacing and graded exposure."  (*Id.*) However, Felix's endurance had improved, and she was fairly compliant with her home exercise program. (*Id.*)  Linkinoggor encouraged Felix to gradually increase her walking distance and activity levels with periodic rest breaks.  (*Id.*)

On September 11, 2018, Felix went to the emergency room with complaints of chest pain that had begun the night before.  (*Id.* at 768.)  An ECG and chest x-ray were normal.  (*Id.* at 770.)  Treatment providers believed it was "not unreasonable to attribute [Felix's] symptoms to non-emergent etiology such as anxiety/fibromyalgia" and continue to be evaluated on an outpatient basis.  (*Id.* at 771.)

On September 17, 2018, Felix saw Dr. Cleland for follow up.  (*Id.* at 899.)  Felix reported no improvement since her last visit.  (*Id.*)  Dr. Cleland noted she had been to the ER for chest pain and her workup was unremarkable.  (*Id.*)  He further noted she had not seen neurology since her last visit.  (*Id.*)  In addition to continued low back pain that radiated into her legs, Felix also described bilateral foot numbness, continued weakness of the right leg, and impaired balance.  (*Id.*)  Felix reported any activity and walking worsened her pain.  (*Id.*)  On examination, Dr. Cleland found tenderness over the gluteal area, greater trochanter, and paraspinal region bilaterally, normal strength of the bilateral lower extremities, reduced range of motion of the back, and normal gait.  (*Id.* at 903.)  Dr. Cleland advised Felix to continue her home exercise program and Neurontin and again recommended she consult neurology regarding her headaches.  (*Id.* at 904.)

On September 20, 2018, Felix saw Dr. Labastille for follow up regarding her hyperlipidemia.  (*Id.* at 835.)  Felix had not been taking her medication and had been non-compliant with her diet and losing weight.  (*Id.*)  Felix also complained of right hip pain for the past three to four months, which had almost caused a fall.  (*Id.*)  On examination, Dr. Labastille found moderate tenderness of the greater trochanteric bursa.  (*Id.* at 837.)  Dr. Labastille offered Felix a cortisone injection for her right hip, which she declined.  (*Id.*)  He continued her Neurontin and referred her to physical therapy for a physical capacity assessment.  (*Id.*)

On September 22, 2018, Felix saw Lisa Philippon, PT, DPT, for a physical therapy evaluation.  (*Id.* at 954.)  Felix complained of pain all over, but especially in her mid-cervical spine.  (*Id.*)  Felix rated

10

her chest and hip pain as an 8/10.  (*Id.*)  Felix reported having done aquatic therapy in the past that temporarily managed her pain.  (*Id.*)  Felix told Philippon her hip pain was worse with walking.  (*Id.*) Massage and water therapy alleviated her pain.  (*Id.*)  On examination, Felix hugged herself with a pained expression and had "slightly slouched posture secondary to reports of pain in bilateral pectorals."  (*Id.*) Philippon found increased muscle tightness in the right mid trapezius and the right paraspinals near the L3-L5 levels and decreased strength that Philippon rated a 3/5 based on functional performance with gait. (*Id.*)  Philippon also noted poor activity tolerance and that Felix's "condition is unpredictable due to chronicity and psychological aspect of presentations."  (*Id.* at 955.)  Felix underwent physical therapy from September 22, 2018 through November 23, 2018.  (*Id.* at 939-953, 989-995.)  Progress notes from physical therapy sessions in October 2018 through November 2018 indicated fair to good progress toward goals, although Felix reported medication and physical therapy were not helping (*Id.* at 939-53, 991, 994- 95.)

On October 3, 2018, Felix saw Dr. Ng for follow up.  (*Id.* at 916.)  On examination, Dr. Ng found kyphosis, lumbar lordosis, tight paraspinal muscles in the thoracic and lumbar areas, multiple tender points, tight bilateral piriformis, tight bilateral PSOAS, and tenderness of the greater trochanter bilaterally. (*Id.* at 917.)  Manual therapy administered during the appointment improved Felix's pain, she felt better, and she had improved range of motion and less tension.  (*Id.* at 918.)  Dr. Ng recommended muscle relaxants and yoga, as well as stretches.  (*Id.*)  Dr. Ng noted Felix had been unable to find a place that offered aquatic therapy.  (*Id.*)  Dr. Ng told Felix she could follow up regarding hip injections.  (*Id.*)

On October 5, 2018, Felix saw rheumatologist Dr. Hong for follow up.  (*Id.* at 923.)  Felix wanted to make sure it was okay that she got an injection.  (*Id.*)  Felix rated her pain as a 9/10, with the worst areas being the neck, chest, and upper back.  (*Id.*)  Felix reported taking Gabapentin and Flexeril as needed, averaging less than one a day and mainly at night.  (*Id.*)  Felix tried replacing Flexeril with

Baclofen, but experienced side effects and went back to Flexeril.  (*Id.*)  Felix did not notice any pain reduction taking high dose Vitamin D for deficiency.  (*Id.*)  Dr. Hong noted Felix was nervous or anxious. (*Id.* at 924.)  On examination, Dr. Hong found tenderness all over, no synovitis, and normal gait.  (*Id.* at 925.)  Dr. Hong recommended Felix follow up with psychiatry to see if switching from Prozac to Savella would be helpful.  (*Id.* at 926.)  Dr. Hong noted that since Felix had no inflammatory arthritis or immune-mediated rheumatic connective tissue disease, he would transfer her care to her primary care physician and pain management.  (*Id.* at 926-27.)

Beginning on October 6, 2018, Felix underwent a series of trigger point injections for pain management.  (*Id.* at 942-43, 946-47, 951.)  On October 26, 2018, Felix reported she did not notice much relief from her last trigger point injection; her biggest pain relief was laying down.  (*Id.* at 942.)

On November 13, 2018, Felix reported worsening of her depression due to her pain not improving and suicidal ideation with plan to her physical therapist.  (*Id.* at 992.)  Jennifer Miller, MSN, APRN-CNP, provided Felix with the suicide lifeline number, called Susan O'Brien, Felix's mental health provider, and attempted to get Felix in to see an acupuncture specialist.  (*Id.* at 993.)

The following day, O'Brien completed a mental capacity medical source statement.  (*Id.* at 956-57.)  O'Brien opined Felix would have marked limitations in the following areas: understanding and learning terms, instructions, or procedures; identifying and solving problems; handling conflicts with others; responding to requests, suggestions, criticism, correction, and challenges; initiating and performing a task that she understands and knows how to do; ignoring or avoiding distractions while working; responding to demands; and distinguishing between acceptable and unacceptable work performance.  (*Id.*) O'Brien further opined Felix would have extreme limitations in the following areas: sequencing multi-step activities; using reason and judgment to make work-related decisions; working at an appropriate and consistent pace; completing tasks in a timely manner; sustaining an ordinary routine and regular

attendance at work; working a full day without needing more than the allotted number of length of rest periods during the day; adapting to changes; managing her psychologically based symptoms; and setting realistic goals.  (*Id.*)  O'Brien based these restrictions on Felix's diagnoses of major depressive disorder, moderate-severe, PTSD, generalized anxiety disorder, and panic attacks.  (*Id.* at 957.)  O'Brien noted Felix's mood was "persistently depressed, discouraged and anxious," Felix had intermittent suicidal ideation and on November 10, 2018 had a suicidal plan due to feeling overwhelmed and despondent, and Felix had low energy, low motivation, chronic pain, and impaired concentration and memory.  (*Id.*)  Felix rarely left the house except for medical appointments.  (*Id.*)

On November 23, 2018, Felix completed her last physical therapy session.  (*Id.* at 989.)  Felix reported minimal relief from therapy and complained of overwhelming pain in her neck and low back, as well as leg fatigue and shaking with most activities of daily living.  (*Id.*)  Felix stated she had difficulty brushing her hair and holding a cup because of weakness in her hands.  (*Id.*)  Felix also complained of a constant headache.  (*Id.*)  However, her mood had improved a little and she denied any suicidal thoughts.  (*Id.*)  On examination, Kimberly Dahodwala, MSN, APRN-CNP, found Felix had hypersensitivity and decreased range of motion, arm strength, and grip strength in the upper extremities, bilateral trapezius stress, decreased sensation to her right leg and foot, decreased leg strength bilaterally, positive seated straight leg raise testing bilaterally, and a slow gait.  (*Id.* at 989-90.)

On December 3, 2018, Felix underwent a physical examination for the purpose of assessing medical disability.  (*Id.* at 958.)  On examination, Felix hugged herself with a pained expression and had "slightly slouched posture secondary to reports of pain in bilateral pectorals."  (*Id.*)  DPT Philippon found increased muscle tightness in the right mid trapezius and the right paraspinals near the L3-L5 levels and decreased strength that Philippon rated a 3/5 based on functional performance.  (*Id.*)  Philippon noted Felix could kneel and pick objects up off the floor with careful movements.  (*Id.*)  While Felix reported

occasionally doing yoga and walking, her pain flared up and prevented her from finishing activities.  (*Id.*)  Philippon again opined Felix's condition was "unpredictable due to chronicity and psychological aspect of presentations."  (*Id.*)

Also on December 3, 2018, Felix saw Miller for follow up.  (*Id.* at 984-85.)  On examination, Miller found Felix had hypersensitivity and decreased range of motion, arm strength, and grip strength in the upper extremities, bilateral trapezius stress, decreased sensation to her right leg and foot, decreased leg strength bilaterally, positive seated straight leg raise testing bilaterally, and a slow gait.  (*Id.* at 984.)

Based on that examination, Miller completed a physical capacity medical source statement.  (*Id.* at 959-60.)  Miller opined Felix was limited to lifting no more than 10 pounds occasionally and one to two pounds frequently, standing and walking no more than 2 hours a day and no more than 15 minutes without interruption, and sitting no more than 6 hours a day and no more than 15 to 30 minutes without interruption.  (*Id.* at 959.)  Miller further opined Felix could rarely climb and crawl, occasionally crouch, kneel, and reach, and frequently balance, stoop, push/pull, and perform fine and gross manipulation.  (*Id.* at 959-60.)  Miller restricted Felix to no heights and no noise.  (*Id.* at 960.)  Miller opined severe pain would interfere with Felix's concentration, would take her off task, and would cause absenteeism.  (*Id.*)  Felix also needed to alternate positions at will and would need additional breaks, although Miller could not assess how much additional rest time Felix would need.  (*Id.*)  Miller identified several examination findings to support these restrictions, including: decreased sensation to Felix's right leg, no relief with treatment, slow gait, positive tenderness to palpation, decreased range of motion in the cervical and lumbar spine, positive straight leg raise and Kemps test, positive trigger points, weak grip strength, and weak leg strength.  (*Id.* at 959-60.)

On January 28, 2019, Felix saw Patricia Paczos, PA, for a follow up rheumatology appointment.  (*Id.* at 1055.)  Felix reported pain all over, but the worst was in her upper back and legs.  (*Id.*)  Felix also

14

complained of trouble concentrating, poor memory, and migraine headaches.  (*Id.*)  Felix told Paczos she was taking Gabapentin and Savella with no relief, but Flexeril helped her sleep a little.  (*Id.*)  Felix reported she felt worse when she tried to exercise.  (*Id.* at 1056.)  The pain management program at Metro told her there was nothing they could do.  (*Id.*)  On examination, Paczos found multiple tender areas, especially the upper back and greater trochanteric bursa, no swelling in the hands or wrists, and normal gait.  (*Id.* at 1060.)  Paczos provided Felix with written information on fibromyalgia, ordered a neck x-ray and labs, referred her to the Cleveland Clinic's pain management program, and encouraged low impact exercise.  (*Id.* at 1061.)

On May 24, 2019, Felix saw Hemalatha Senthilkumar, M.D., for follow up.  (*Id.* at 1073.)  Felix reported she had been anxious for a while, but it was getting worse.  (*Id.*)  She also felt sad and was now willing to get counseling.  (*Id.*)  On examination, Dr. Senthilkumar found a normal gait and no spine tenderness.  (*Id.* at 1074.)  Dr. Senthilkumar ordered a trial of a TENS unit.  (*Id.*)

On June 27, 2019, Felix saw Michael Harris, M.D., for pain management.  (*Id.* at 1106.)  Felix complained of increasing neck pain that she feared may not be fibromyalgia pain.  (*Id.*)  Dr. Harris reviewed Felix's imaging and felt the presentation was "quite consistent with fibromyalgia and her pain complaints far outweigh findings on exam and imaging studies."  (*Id.* at 1106-07.)  Dr. Harris noted he was concerned about Felix's worsening depression.  (*Id.* at 1107.)  Felix complained of memory issues and thought the Savella her doctor started her on may be making her memory worse.  (*Id.*)  On examination, Dr. Harris found diffuse myofascial pain in the cervical paraspinals, upper trapezii, interscapular region, and lumbar spine and pain in the end range of all planes in the cervical spine.  (*Id.* at 1108.) Spurling's testing increased Felix's neck pain.  (*Id.*)  Dr. Harris diagnosed Felix with depression, anxiety, fibromyalgia, mild cervical and lumbar degenerative disc disease, and worsening memory possibly related to Savella.  (*Id.*)  Dr. Harris ordered an x-ray of the cervical spine, prescribed Voltaren

gel, recommended Felix talk to her psychiatrist about Savella causing memory issues, and suggested Felix be more consistent with her home exercise program. (*Id.*) The x-ray of the cervical spine revealed mild progression of degenerative changes at C5-C6 and C6-C7. (*Id.* at 1114.)

## C.   State Agency Reports

### 1.   Mental Impairments

On August 14, 2018, Robyn Murry-Hoffman, Ph.D., reviewed the file and adopted the previous psychiatric review technique findings from the February 28, 2018 ALJ decision based on AR 98-4. (*Id.* at 105, 117.)

On September 27, 2018, on reconsideration, Cynthia Waggoner, Psy.D., determined the additional information submitted/obtained supported the prior findings, with minimal or no significant change from the initial findings of the psychiatric review technique. (*Id.* at 131, 146.)

### 2.   Physical Impairments

On August 16, 2018, Gerald Klyop, M.D., reviewed the file and adopted the previous residual functional capacity ("RFC") from the February 28, 2018 ALJ decision based on AR 98-4. (*Id.* at 107, 119.)

On September 27, 2018, on reconsideration, Steve E. McKee, M.D., determined the additional information submitted/obtained supported the prior findings, with minimal or no significant change from the initial RFC findings. (*Id.* at 133, 148.)

## D.   Hearing Testimony

During the September 18, 2019 hearing, Felix testified to the following:

- She lives in a one-story home. (*Id.* at 45.) She has a driver's license and her own car, and she can drive. (*Id.* at 45-46.) Her daughter drove her to the hearing. (*Id.* at 45.)

- In the past year and a half, her pain has gotten worse. (*Id.* at 52-53.) She has constant pain all over her body. (*Id.* at 53.) The pain is the same all the time. (*Id.*) Her pain is an eight or nine out of ten. (*Id.* at 53-54.) She takes medication for her pain as

prescribed, but it does not help.  (*Id.* at 54.)  Her doctor has changed her medication and it still does not help.  (*Id.*)  She has tried everything, including physical therapy, which did not help at all.  (*Id.* at 56.)  She has gotten a few injections, which did not help.  (*Id.* at 70.)  She can sit for maybe 30 minutes before she gets more back and neck pain.  (*Id.* at 56-57.)  She can stand for maybe 20 minutes.  (*Id.* at 56.)  Her pain interferes with her sleep, as do her migraines, so she sleeps maybe four ho urs a night.  (*Id.* at 58.)  She cannot sleep during the day.  (*Id.*)  She can handle her personal hygiene herself, but her daughter comes in every other day to help her with her hair, clean the house, do laundry, and vacuum.  (*Id.* at 58-59.)  Sometimes she shops for groceries herself, and sometimes her daughter does it for her.  (*Id.* at 59.)  She does not have any hobbies anymore and does not go out anywhere anymore.  (*Id.* at 60.)

- At the hearing, she was moving around in her chair and tapping her foot because of the pain.  (*Id.* at 70-71.)

- She does not use any assistive devices or wear any splints or braces.  (*Id.* at 55.)

- She has had suicidal thoughts and attempts in the past year and a half, although she had not been hospitalized for a suicide attempt.  (*Id.* at 60.)  Once a week she hears the voice of someone who abused her in the past.  (*Id.* at 61-62.)  Counseling helps a little bit.  (*Id.* at 62.)  She takes medication that makes the voice go away.  (*Id.* at 63.)  She sometimes struggles to get along with other people and likes to be alone.  (*Id.*)  The only other person she sees besides her daughter on a regular basis is her mother.  (*Id.*)  She gets panic attacks if she must go places where other people are present.  (*Id.* at 64.)  She goes home and stays in her room after that.  (*Id.* at 65.)  In the past year and a half, she has not gone anywhere except for her doctor's appointments and sometimes the grocery store.  (*Id.* at 68.)  In the past year and a half, her depression has gotten worse.  (*Id.* at 66.)

- She struggles with memory and forgetfulness.  (*Id.* at 65.)  Sometimes she forgets the address of her appointments, even when she's going back to a place she's been before.  (*Id.* at 65-66.)

The VE testified Felix had past work as a punch press operator II.  (*Id.* at 74.)  The ALJ then posed the following hypothetical question:

> All right.  I'm going to ask you some hypothetical questions.  For each of these assume the individual has the same age, education, and the experience you just characterized as the Claimant.  The first is capable of a light level of exertion, frequent foot and hand controls, occasional climbing ramps and stairs, no climbing ropes, ladders, and scaffolds, frequent balance and stoop, occasional kneel, crouch, no crawl, occasional overhead reaching, frequent handling and fingering, no exposure to hazards, such as unprotected heights, moving mechanical parts, or operating a motor vehicle, simple tasks and simple work-related decisions in a routine work setting with changes that are easily explained, goal-

17

oriented, but no fast-paced or production quota rate work, superficial interactions with supervisors, co-workers, and the public, meaning the work does not require negotiating with, instructing, persuading, or directing the work of others. Based on this hypothetical, would the individual be able to perform the past work, either as actually or generally performed?

(*Id.* at 74-75.)

The VE testified the hypothetical individual would not be able to perform Felix's past work as a punch press operator II. (*Id.* at 75.) The VE further testified the hypothetical individual would be able to perform other representative jobs in the economy, such as marker, checker, and garment sorter. (*Id.* at 76.)

The ALJ then changed the exertional level to sedentary. (*Id.*) The VE testified the hypothetical individual could perform representative jobs in the economy, such as sorter, dial marker, and ink printer. (*Id.* at 77.)

Felix's counsel asked the VE whether a hypothetical individual who could sit for a total of six hours in a workday and stand for less than one hour total in a workday could perform any work in the national economy. (*Id.* at 78.) The VE testified the hypothetical individual could not perform in competitive employment, as that was less than full-time hours. (*Id.*)

### III.    STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315, 404.1505(a).

A claimant is entitled to a POD only if: (1) she had a disability; (2) she was insured when she became disabled; and (3) she filed while she was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

18

A disabled claimant may also be entitled to receive SSI benefits.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981).  To receive SSI benefits, a claimant must meet certain income and resource limitations.  20 C.F.R. §§ 416.1100, 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4).  *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application.  20 C.F.R. §§ 404.1520(b) *and* 416.920(b).  Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c), 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience.  *See* 20 C.F.R. §§ 404.1520(d), 416.920(d).  Fourth, if the claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f), 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), 416.920(g).

Here, Felix was insured on the earliest possible disability onset date, March 1, 2018, and remained insured through December 31, 2020, her date last insured ("DLI").  (*Id.* at 15-16.)  Therefore, in order to be entitled to POD and DIB, Felix must establish a continuous twelve-month period of disability commencing between these dates.  Any discontinuity in the twelve-month period precludes an entitlement

to benefits.  *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

## IV.   SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.   The claimant meets the insured status requirements of the Social Security Act through December 31, 2020.

2.   The claimant has not engaged in substantial gainful activity since September 11, 2015, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3.   The claimant has the following severe impairments: cervical degenerative disc disease, fibromyalgia, depressive disorder, anxiety disorder, post-traumatic stress disorder (PTSD) with psychosis (20 CFR 404.1520(c) and 416.920(c)).

4.   The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.   After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except frequent foot and hand controls; occasional climbing ramps and stairs, no climbing ropes, ladders, and scaffolds, frequent balance and stoop, occasional kneel, crouch, and no crawl; occasional overhead reaching, and frequent handling and fingering.  She is limited to no exposure to hazards, such as unprotected heights, moving mechanical parts, or operating a motor vehicle.  She is limited to simple tasks and simple work-related decisions in a routine work setting with changes that are easily explained; goal-oriented, but no fast-paced or production quota rate work; and superficial interactions with supervisors, coworkers, and the public, meaning the work does not require negotiating with, instructing, persuading, or directing the work of others.

6.   The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.   The claimant was born on November **, 1972 and was 42 years old, which is defined as a younger individual age 45-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.   The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11.  The claimant has not been under a disability, as defined in the Social Security Act, from September 11, 2015, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 18-29.)

## V.  STANDARD OF REVIEW

The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a

different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir.2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached."). This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g., White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-1300, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-cv-734, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, No. 2:10-CV-017, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

# VI.  ANALYSIS

## A.    Opinion Evidence

Felix argues the ALJ erred in reviewing the medical opinions of treating providers Jennifer Miller and Susan O'Brien.  (Doc. No. 14 at 14-20.)  With respect to Miller's opinion, Felix asserts the ALJ failed to give "good reasons" for rejecting Miller's opinion as unpersuasive and the reasons the ALJ provided "are not supported by the facts or evidence of record."  (*Id.* at 19.)  With respect to O'Brien's opinion, Felix argues the ALJ overlooked or ignored findings supportive of disability and only focused on normal findings.  (*Id.* at 20.)  In addition, Felix asserts that minimal levels of functioning do not mean a person cannot also be markedly or extremely impaired in certain areas.  (*Id.*)  Felix maintains the ALJ's evaluation of the opinion evidence fails to build a logical bridge from the evidence to his RFC findings. (*Id.*)

The Commissioner responds that Felix's arguments should be rejected as they are based on an outdated standard for evaluating medical evidence.  (Doc. No. 15 at 16.)  The Commissioner argues the ALJ explained the lack of consistency and supportability that caused him to find both opinions unpersuasive.  (*Id.*)

Since Felix's claim was filed after March 27, 2017, the Social Security Administration's new regulations ("Revised Regulations") for evaluation of medical opinion evidence apply to this claim. *See Revisions to Rules Regarding the Evaluation of Medical Evidence (Revisions to Rules)*, 2017 WL 168819, 82 Fed. Reg. 5844 (Jan. 18, 2017); 20 C.F.R. §§ 404.1520c, 416.920c.

Under the Revised Regulations, the Commissioner will not "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical findings, including those from your medical sources."  20 C.F.R.  §§ 404.1520c(a), 416.920c(a).  Rather, the

Commissioner shall "evaluate the persuasiveness" of all medical opinions and prior administrative medical findings using the factors set forth in the regulations: (1) supportability;[4] (2) consistency;[5] (3) relationship with the claimant, including length of the treatment relationship, frequency of examinations, purpose of the treatment relationship, extent of the treatment relationship, and examining relationship; (4) specialization; and (5) other factors, including but not limited to evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of the agency's disability program's policies and evidentiary requirements.  20 C.F.R. §§ 404.1520c(a), (c)(1)-(5); 416.920c(a), (c)(1)-(5).  However, supportability and consistency are the most important factors.  20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2).

The Revised Regulations also changed the articulation required by ALJs in their consideration of medical opinions.  The new articulation requirements are as follows:

> (1) Source-level articulation. Because many claims have voluminous case records containing many types of evidence from different sources, it is not administratively feasible for us to articulate in each determination or decision how we considered all of the factors for all of the medical opinions and prior administrative medical findings in your case record. Instead, when a medical source provides multiple medical opinion(s) or prior administrative medical finding(s), we will articulate how we considered the medical opinions or prior administrative medical findings from that medical source together in a single analysis using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate. We are not required to articulate how we considered each medical opinion or prior administrative medical finding from one medical source individually.
>
> (2) Most important factors. The factors of supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section) are the

---

[4] The Revised Regulations explain the "supportability" factor as follows: "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1).
[5] The Revised Regulations explain the "consistency" factor as follows: "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." 20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2).

24

most important factors we consider when we determine how persuasive we find a medical source's medical opinions or prior administrative medical findings to be. Therefore, we will explain how we considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in your determination or decision. We may, but are not required to, explain how we considered the factors in paragraphs (c)(3) through (c)(5) of this section, as appropriate, when we articulate how we consider medical opinions and prior administrative medical findings in your case record.

(3) Equally persuasive medical opinions or prior administrative medical findings about the same issue. When we find that two or more medical opinions or prior administrative medical findings about the same issue are both equally well-supported (paragraph (c)(1) of this section) and consistent with the record (paragraph (c)(2) of this section) but are not exactly the same, we will articulate how we considered the other most persuasive factors in paragraphs (c)(3) through (c)(5) of this section for those medical opinions or prior administrative medical findings in your determination or decision.

20 C.F.R. §§ 404.1520c(b)(1)-(3), 416.920c(b)(1)-(3).

"Although the regulations eliminate the 'physician hierarchy,' deference to specific medical opinions, and assigning 'weight' to a medical opinion, the ALJ must still 'articulate how [he/she] considered the medical opinions' and 'how persuasive [he/she] find[s] all of the medical opinions.'" *Ryan L.F. v. Comm'r of Soc. Sec.,* No. 6:18-cv-01958-BR, 2019 WL 6468560, at *4 (D. Ore. Dec. 2, 2019) (quoting 20 C.F.R. §§ 404.1520c(a), (b)(1); 416.920c(a), (b)(1)).   A reviewing court "evaluates whether the ALJ properly considered the factors as set forth in the regulations to determine the persuasiveness of a medical opinion." *Id.*

### 1.   Miller's Opinion

The ALJ found as follows with respect to Miller's opinion:

I also considered a Medical Source Statement: Patient's Physical Capacity form signed by Jennifer Miller, CNP, dated December 3, 2018 (Ex. B13F).  Ms. Miller opined the claimant could lift and carry 5-10 pounds occasionally and 1-2 pounds frequently, stand/walk two hours total and .25 hours without interruption, and sit six hours total and .25-.50 without interruption.    The claimant could frequently balance and stoop, occasionally crouch and kneel, rarely climb and crawl, occasionally reach,

25

and frequently push/pull and perform fine and gross manipulation. Environmental restrictions include heights. Ms. Miller also noted the claimant has severe pain that interferes with concentration, takes off task, and causes absenteeism and would require additional unscheduled breaks during an eight-hour workday, although noted she was unable to assess how much additional rest time would be required.

I find Ms. Miller's opinion unpersuasive because she based much of her opinion on subjective reporting by the claimant that included difficulty with isolation, feeling overwhelmed, and chronic pain (Ex. B10F, B16F, B18F). I also find Ms. Miller's opinion is inconsistent with examinations that showed system functioning within normal limits. For example, examinations indicated the claimant maintained normal, steady, non-antalgic gait with no assistive device, intact sensation, and normal coordination (Ex. B3F/7, 9, 19, B4F/10, 19, B5F/12, 26, 35, B6F/8, 10, B7F/8, 41, B8F/12, 19, B9F/3, 24-25, 47, 55, B15F/13 B19F/12, B20F/2, B21F/8). In addition, I find Ms. Miller's opinion inconsistent with a conservative course of treatment for fibromyalgia and imaging that showed minimal progression of the claimant's cervical degenerative disc disease (Ex. B3F/11-17, B4F, B5F, B7F, B8F/8, 22, 31, B9F, B19F/13, B20F/2, B21F/7, 14).

(Tr. 26.)

The undersigned finds the ALJ erred in his evaluation of Miller's opinion. Contrary to the ALJ's assertion, Miller provided many reasons for her opinion that were not based on Felix's subjective reports, including decreased sensation in the right leg, slow gait, positive tenderness to palpation of the SI joints and paraspinal muscles bilaterally, decreased range of cervical and lumbar range of motion in all planes, positive orthopedic tests, positive straight leg raise tests, positive Kemp's, positive trigger points, and weak grip and leg strength. (*Id.* at 959-60.) Moreover, the ALJ fails to mention anywhere in his decision the examination findings from the physical examination Miller conducted the same day she rendered her opinion, which also supported her opinion. (*Id.* at 984-85.)

The remainder of the reasons the ALJ provided for finding Miller's opinion unpersuasive concern Felix's normal functioning, imaging showing mild progression of degenerative disc disease, and a conservative course of treatment for her fibromyalgia. As this Court has previously explained:

It is clear, however, that the lack of "objective" medical evidence is not unusual, but rather the norm in fibromyalgia cases. *See Rogers,* 486 F.3d at 244 (noting that CT scans, x-rays, and minor abnormalities "are not highly relevant in diagnosing [fibromyalgia] or its severity"); *Preston,* 854 F.2d at 817–818 (stating that "[t]here are no objective tests which can conclusively confirm" fibromyalgia); *Keating v. Comm'r of Soc. Sec.,* 2014 WL 1238611 at * 6 (N.D.Ohio March 25, 2014) ("This circuit has recognized that symptoms of fibromyalgia are often not supportable by objective medical evidence"); *Schlote v. Astrue,* 2012 WL 1965765 at * 6 (N.D.Ohio May 31, 2012). Similarly, the fact that Dr. Perryman's physical examinations of Turner's extremities and neurological systems "yielded normal findings" is not necessarily inconsistent with fibromyalgia. Indeed, the Sixth Circuit has repeatedly and consistently recognized that fibromyalgia patients typically "manifest normal muscle strength and neurological reactions and have a full range of motion." *Kalmbach v. Comm'r of Soc. Sec.,* 409 Fed. Appx. 852, 861–862 (6th Cir.2011) (citing *Preston,* 854 F.2d at 820). *See also Minor v. Comm'r of Soc. Sec.,* 513 Fed. Appx. 417, 434 (6th Cir.2013) (noting fibromyalgia claimants "demonstrate normal muscle strength and neurological reactions and can have a full range of motion"); *Keating,* 2014 WL 1238611 at * 6.

*Turner v. Colvin*, Case No. 1:13CV1916, 2014 WL 4930677, at *15 (N.D. Ohio Aug. 7, 2014), *report and recommendation adopted by* 2014 WL 4930680 (N.D. Ohio Oct. 1, 2014).  The ALJ's rejection of Miller's opinion "on the basis that there was insufficient support in the 'objective findings' is troubling given the ALJ's explicit finding that Plaintiff suffered from fibromyalgia."  *Cotto v. Berryhill*, Case No. 1:16-cv-01646, 2017 WL 1399986, at *8 (N.D. Ohio Apr. 3, 2017), *report and recommendation adopted by* 2017 WL 1387155 (N.D. Ohio Apr. 18, 2017).

Regarding Felix's "conservative treatment" for fibromyalgia, Felix's argument that there is no invasive or surgical treatment available to treat fibromyalgia is well-taken.  (Doc. No. 14 at 19.)  In addition, the ALJ's statement earlier in the opinion that the record lacked "evidence of extensive or repeated hospitalizations, emergency department visits for exacerbations . . . ongoing testing, or physician intervention" is misleading at best.  (Tr. 25.)  As detailed above in the medical evidence, Felix repeatedly and consistently sought out medical treatment from her primary care doctor, her pain management doctor, her rheumatologists, and physical therapists for her fibromyalgia pain.  Felix also went to the emergency

27

room for chest pain that providers determined was likely caused by her fibromyalgia or anxiety.  As the ALJ recognized, Felix underwent repeated imaging and lab tests, tried multiple therapies, and in 2019 was prescribed a TENS unit.  (Tr. 22-23.)  Moreover, the ALJ's statement about her lack of treatment is inconsistent with his recognition that one treatment provider had found Felix's presentation consistent with fibromyalgia and that her pain complaints "far outweigh[ed]" the examination findings and imaging.  (*Id.* at 23.)  The ALJ therefore failed to build an accurate and logical bridge from his findings to his conclusions.  *Fleischer*, 774 F. Supp. 2d at 877 (N.D. Ohio 2011).

Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal.  *See, e.g., White*, 572 F.3d at 281; *Bowen*, 478 F.3d at 746 ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Although the new standards are less stringent in their requirements for the treatment of medical opinions, they still require that the ALJ provide a coherent explanation of his reasoning.  Here, the ALJ failed to build an accurate and logical bridge from the evidence to his conclusions in his evaluation of Miller's opinion.  As a result, the undersigned recommends the ALJ's decision be VACATED AND REMANDED for proper articulation regarding this opinion.

### 2.    O'Brien's Opinion

The ALJ found as follows with respect to O'Brien's opinion:

> In addition, I considered a Medical Source Statement – Mental Capacity form signed by Susan O'Brien, APRN, PMHCNS-BC dated November 14, 2018 (Ex. B11F).  Ms. O'Brien opined the claimant has moderate to extreme limitation in understand, remember or apply information, mild to marked limitation in interact with others, moderate to extreme limitation in concentrate, persist, or maintain pace, and no to extreme limitation in adapt or manage oneself.  I find this opinion unpersuasive to the extent it is inconsistent with the record that does not support marked or extreme

limitation in any areas of mental functioning.  For example, examinations indicated the claimant presented as oriented, cooperative, and pleasant with good eye contact, normal speech and communication, organized, linear, goal-directed thought process, adequate fund of knowledge, good grooming and hygiene, normal insight, judgment, and behavior (Ex. B3F/9-19, B4F/9-24, B5F/17, B6F/6, 8, B7F/8, B8F/10-19, B9F/3, 55, B15F/13).   She also showed good learning response, verbalized understanding, could follow and tract [sic] conversation, and presented to appointments on time and unaccompanied (Ex. B3F/9, 12-14, B4F/22, 25, B5F/17, 27, B6F/8, B7F/41, B8F/13, 19, 22).

(Tr. 26-27.)

Felix argues the ALJ "fail[ed] to document, entirely," a past suicidal ideation with plan and that the ALJ ignored "substantial evidence that Ms. Felix was routinely depressed, anxious, had auditory and visual hallucinations, had thoughts of wanting to be dead, was discouraged, had low energy and low motivation, and impaired concentration."  (Doc. No. 14 at 20.)  The ALJ acknowledged these positive findings in his discussion of the record evidence regarding Felix's mental impairments.   (Tr. 24.) However, as the undersigned recommends this matter be remanded for the reasons set forth above, on remand the ALJ will have the opportunity to consider the evidence regarding Felix's mental impairments and O'Brien's opinion in formulating the RFC.

## B.    Evaluation of Fibromyalgia

Felix argues the ALJ's evaluation of the record evidence regarding Felix's fibromyalgia "focuses almost exclusively on the absence of objective findings," as well as the "conservative" fibromyalgia treatment she received.  (Doc. No. 14 at 13.)  Felix asserts, "This is error where both case law and the SSR recognize that fibromyalgia rarely is shown through objective evidence and the substantial evidence in this record documents severe and persistently disabling pain."  (*Id.*)

The Commissioner responds that the AL properly evaluated Felix's fibromyalgia symptoms. (Doc. No. 15 at 11.)

The RFC determination sets out an individual's work-related abilities despite his or her limitations. *See* 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).  A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner.  *See* 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).  An ALJ "will not give any special significance to the source of an opinion on issues reserved to the Commissioner." *See* 20 C.F.R. §§ 404.1527(d)(3), 416.927(d)(3).  As such, the ALJ bears the responsibility for assessing a claimant's RFC based on all the relevant evidence (20 C.F.R. §§ 404.1546(c), 416.946(c)) and must consider all of a claimant's medically determinable impairments, both individually and in combination.  *See* SSR 96–8p, 1996 WL 374184 (SSA July 2, 1996).

"In rendering his RFC decision, the ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support his decision, especially when that evidence, if accepted, would change his analysis." *Fleischer*, 774 F. Supp. 2d at 880 (citing *Bryan v. Comm'r of Soc. Sec.*, 383 F. App'x 140, 148 (3d Cir. 2010) ("The ALJ has an obligation to 'consider all evidence before him' when he 'mak[es] a residual functional capacity determination,' and must also 'mention or refute [...] contradictory, objective medical evidence' presented to him.")).  *See also* SSR 96-8p, 1996 WL 374184, at *7 (SSA July 2, 1996) ("The RFC assessment must always consider and address medical source opinions.  If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted.")).  While the RFC is for the ALJ to determine, the claimant bears the burden of establishing the impairments that determine her RFC.  *See Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999).

It is well-established there is no requirement that the ALJ discuss each piece of evidence or limitation considered.  *See, e.g., Conner v. Comm'r*, 658 F. App'x 248, 254 (6th Cir. 2016) (citing *Thacker v. Comm'r*, 99 F. App'x 661, 665 (6th Cir. May 21, 2004) (finding an ALJ need not discuss every piece of evidence in the record); *Arthur v. Colvin*, No. 3:16CV765, 2017 WL 784563, at *14 (N.D. Ohio

Feb. 28, 2017) (*accord*).  However, courts have not hesitated to remand where an ALJ selectively includes only those portions of the medical evidence that places a claimant in a capable light and fails to acknowledge evidence that potentially supports a finding of disability.  *See e.g., Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 724 (6th Cir. 2014) (reversing where the ALJ "cherry-picked select portions of the record" rather than doing a proper analysis); *Germany–Johnson v. Comm'r of Soc. Sec.*, 313 F. App'x 771, 777 (6th Cir. 2008) (finding error where the ALJ was "selective in parsing the various medical reports").  *See also Ackles v. Colvin*, No. 3:14cv00249, 2015 WL 1757474, at *6 (S.D. Ohio April 17, 2015) ("The ALJ did not mention this objective evidence and erred by selectively including only the portions of the medical evidence that placed Plaintiff in a capable light."); *Smith v. Comm'r of Soc. Sec.*, No. 1:11-CV-2313, 2013 WL 943874, at *6 (N.D. Ohio March 11, 2013) ("It is generally recognized that an ALJ 'may not cherry-pick facts to support a finding of non-disability while ignoring evidence that points to a disability finding.'"); *Johnson v. Comm'r of Soc. Sec.*, No. 2:16-cv-172, 2016 WL 7208783, at *4 (S.D. Ohio Dec. 13, 2016) ("This Court has not hesitated to remand cases where the ALJ engaged in a very selective review of the record and significantly mischaracterized the treatment notes.").

As the undersigned recommends this matter be remanded for error in the evaluation of Miller's opinion, on remand the ALJ will have the opportunity to consider the evidence regarding Felix's fibromyalgia in formulating the RFC.

### VII.   CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be VACATED AND REMANDED for further proceedings consistent with this opinion.

Date:  August 3, 2021

  *s/ Jonathan Greenberg*
Jonathan D. Greenberg
United States Magistrate Judge

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).